(47 South. 694.)

No. 17,119.

BRANDON v. SLADE.

(Nov. 30, 1908.)

1. VENDOR AND PURCHASER (§ 15*)—CONSIDERATION—SUFFICIENCY.

In an action to rescind a sale for lesion beyond moiety, a debt secured by mortgage on the property and assumed by the purchaser would ordinarily be taken, at its face value, as part of the purchase price; but, where the debt has been reduced by partial payment, though not entered of record or evidenced by writing, and the creditor, participating in the negotiations leading to the sale, agrees, in advance, to receive the balance really due in full satisfaction, the amount actually paid by the purchaser is alone to be considered in determining the price paid.

[Ed. Note.—For other cases, see Vendor and Purchaser, Dec. Dig. § 15.*]

2. VENDOR AND PURCHASER (§ 104*)—RESCISSION BY SELLER—ACTION.

Where a judgment fixes the amount to be paid by the purchaser to confirm a sale attacked for lesion beyond moiety (there being no questions of profit or improvements in the case), the amount to be reimbursed by the seller, in the event the purchaser elects to rescind the sale, should represent the difference between the ascertained value of the property at the date of the sale and the amount which the purchaser is decreed to pay in order to make up such value, should he elect to affirm the sale.

[Ed. Note.—For other cases, see Vendor and Purchaser, Dec. Dig. § 104.*]

(Syllabus by the Court.)

Appeal from Fourth Judicial District Court, Parish of Union; Robert Brooks Dawkins, Judge.

Action by Julia F. Brandon against W. K. Slade. Judgment for plaintiff, and defendant appeals. Amended and affirmed.

Clifton Mathews, curator ad hoc, for appellant. Price, Roberts & Warren and Harvey Goodwyn Fields, for appellee.

Statement of the Case.

MONROE, J. Plaintiff sues to rescind a sale for lesion beyond moiety of a tract of land situated in the parish of Union, and containing 490 acres, more or less. She alleges that:

The "deed sets forth that the said Slade paid to petitioner the sum of $400, as the purchase price of said land, * * * that this is fraudulent and erroneous, and that the said W. K. Slade paid petitioner the sum of $200, and no more, and * * * that the said land was at the time of the sale well worth the sum of $2,500."

She further alleges that defendant is a nonresident of the state, and she prays that a curator ad hoc be appointed to represent him and that she have judgment revoking and rescinding said sale "on account of lesion beyond moiety," etc.

We gather from the evidence in the record and the admissions of counsel that the land in question had belonged to the community which existed between plaintiff and her first husband, W. L. Montgomery; that Montgomery died in or about the year 1877, leaving three children as the issue of the marriage with plaintiff, and four by a previous marriage, and that, as a result of a settlement made with the latter, the title to the land in dispute vested in plaintiff and her three children—one undivided half to her and a like proportion to them. One of her children died, but whether testate or intestate, married or unmarried, does not appear. Another child married defendant's brother, J. J. Slade, concerning whose connection with the transaction out of which this litigation has arisen we learn the following from the record, to wit: In September, 1900, he became the transferee of a judgment, bearing date April 18, 1894, and duly recorded in favor of Sample & Co., and against his mother-in-law, for $400, with interest at 5 per cent. from December 20, 1894, which judgment had been revived at his instance for the whole amount in September, 1904. Some time after the acquisition of the judgment thus referred to, he had sold from the land here in question timber to the value of $500, for which, so far as we are informed, he has made no accounting to plaintiff, save as appears from the following testimony given by her, to wit:

"Q. How many children had you paid off of their father's interest in this land? A. I paid off two, and Slade paid off part of one, but he sold the timber."

Being asked whether Mrs. Slade had given a receipt in the settlement made with her, plaintiff said:

"No, sir; the settlement was made down here. I paid a part, and gave a note for the balance, and I went home and turned over a mule and cow and calf, and a two-horse wagon and mule that I gave $110 for, and I didn't owe her but $110. Q. Did they give you any receipt for this? A. No, sir; she sent me the note that I gave when I paid it. Q. Well, how much did you pay Mr. Slade on that interest matter to settle it? (Objection and ruling). A. Over $210; for I gave her more in property in the end than it taken to pay the $210."

Slade does not deny that he sold the timber for $500, but he does not tell us what he did with the proceeds. He admits that his wife received $110, but asserts that there is still something due her, though he is unable to state the amount.

On that subject and on the subject of the amount received by him as in satisfaction of the judgment of which he was the transferee, his testimony is as follows:

"Q. How much has been paid you on that judgment, by Mrs. Brandon, since you bought it? A. She has not paid me anything. Q. Who has settled with you for the judgment? A. W. K. Slade. Q. Did he settle before or since he traded for this land? A. Since he bought her interest. Q. Do you remember how much he paid you on the judgment? A. I don't know. I first sold my entire interest for $415. Q. What did your interest include? A. I don't know. Q. The trade that you speak of—the sale for $415—was your wife a party to that, was her interest in that? A. Yes, sir. By the Court: Q. You mean her interest in the land? A. Yes, sir. Q. Together with your interest in the judgment? A. Yes, sir. * * * Q. Do you remember the occasion when W. K. Slade bought this land from Mrs. Brandon and the deed was signed—were you present? A. No, sir. * * * Q. What, if anything, did you have to do with the sale of this land from her to him? A. Nothing at all. She sold the land of her own free will, and afterwards danced over the floor and told her daughter she was going to visit Texas. She was proud of it—proud of the sale. * * * Q. Mr. Slade, Mrs. Montgomery [meaning Mrs. Brandon] settled with your wife, didn't she? A. Not in full. Q. Didn't she give your wife a note to pay that? A. Up the other; no, sir. Q. She gave a note to pay the balance, didn't she? A. I don't know as she did. Q. Wasn't that what the note was for? A. Don't the records show? (Objection and ruling.) A. She paid us $110. Q. The note was given as part payment, wasn't it? A. I don't know nothing about that note. Q. You never saw it? A. I saw a note. Q. Now, Mr. Slade, when was it that you offered this place to Mr. Clark? A. I don't know exactly. I think it was about three years ago. * * * Q. How much did you give for that judgment? A. I gave $425, I believe. By the Court: Q. About how much? A. About $425, I believe. Q. You sold it for less than you gave? A. Yes, sir. Q. What did you get for it? A. $415. Q. How much of that amount was your wife's? A. That was my entire interest in it and my wife's interest. Q. In the estate, you mean? A. Yes, sir. Q. What is your wife's interest in the $415 estimated? A. I don't know. I have never found out. Q. How did you estimate your interest in the judgment that you sold? A. I don't know. I traded the judgment with the face value being worth $400, and let him have 70 acres of land in it. Q. Well, did you actually get $415 in cash for this judgment? A. For my interest in the whole thing—made a lumping deal of the land and my wife's interest. * * * Q. Is that 70 acres of land counted in this 490 acres? A. Yes, sir."

R. A. Gibson, a witness for the defendant, testifies that he was waked up between midnight and daylight (on a sleety night) by one of Jim Slade's sons, who said that his father had gone crazy, and requested him to go to the house (where Slade and plaintiff were living); that he sent for defendant, and they went together; that plaintiff spoke to him about the land, and he told her, "If you sell this land, don't blame nobody but yourself"; that he told defendant, "If you buy this land, buy it straight," and he (defendant) "remarked he was buying it for W. K. Slade, or for Mollie and the children, or something like that"; that he heard no conversation between plaintiff and defendant—he heard them talking—but did not hear what they said; that, according to his recollection, defendant was to pay plaintiff $200 and was to pay off "those other matters." Being asked, "Q. Was anything said about what sort of matters were intended?" he replied:

"It was a recorded judgment down here and something about owing Jim. He was to pay him and to pay this judgment. I don't know. They figured up. I don't know what the amount

was. * * * Q. Wasn't that talked over in preparing the deed that he [J. J. Slade] was crazy, and it would make his mind all right? A. It wasn't before me, Doctor. Q. You didn't hear it, that day, at all? A. No, sir; Jim was in the shed room, and he sent for me to go in there, once or twice, and I just wouldn't listen to any of it. I didn't know anything about it. That it was Jim Slade's troubles, and I didn't want to have anything to do with it, and Mrs. Montgomery came in and was talking to me about selling the land, and I told her that she had her land, and, if she sold it, she need never blame anybody but herself. Q. Did Jim Slade and W. K. Slade talk that day? A. He went into the room where Jim was, after we got there, and stayed in the room a minute or two and came back where we were. I think, possibly, he might have gone in there one time more."

This witness, it may be remarked, was one of the subscribing witnesses to the act of sale here in question; the other subscribing witness, he by whom the act was prepared, not having testified in the case.

Plaintiff says in her testimony that defendant and the witness Gibson were sent for by Jim Slade; that the deed was written after they arrived. Being asked, "At whose request?" she replied:

"At Jim Slade's, I reckon. I thought they were just straightening up the old deed, but, come to find out, they were straightening up a deed for me to sign it. I thought they were just getting my old deed straightened, and they was writing a new deed and wanted me to sign it, after it was wrote, and I told Mr. W. K. Slade that I did not want to sell my home, and he said it wasn't no sale. Q. Now, do you know how much of this land had timber on it? A. No, sir. Q. Were you wanting to sell your place at that time? A. I never had offered it for sale in my life. * * * I never had thought of no price. I wouldn't take anything for my home, and I told Mr. Slade I wouldn't, and he told me it wasn't no sale. Q. Would you have taken $2,500 for your place? What was your place worth, Mrs. Montgomery? A. I really don't know. The house on it cost $1,-200 or $1,500, and it was worth as much to me as it was to anybody else. I had it mortgaged and sold the timber to pay the mortgage until they fooled me out of it. Q. Do you know what land was selling at per acre in that community, the same quality as your land was in 1906, February, that year? A. No, sir."

On her cross-examination plaintiff testified, in part, as follows:

"Q. Mrs. Brandon, you say you got $200 for this place? A. I got it in a way. Q. In what way did you get it? A. I got it in a lying way. Wherry Slade told me a lie to get it. Q. Told you a lie to get you to do it? A. I told him I didn't want to to sell my place, and I refused to take the money, and they pushed it on me."

Being asked whether she had returned the $200 to defendant, or offered it to him, she replied:

"A. No; what I want to offer it to him for? His brother had it, and he could have got it any time he wanted it. He said he wasn't doing it for himself. He was doing it for his brother. Q. Have you ever offered the $200 to him? A. No. Q. Are you ready to pay him back that $200 to-day? A. I ain't never got paid myself for it. He got the land and money too. Q. You don't intend to pay him back that $200? A. No; I never sold no land. He said it wasn't no sale. * * * Q. Are you willing to pay W. K. Slade $200 to get this land back? A. Well, if they turn everything back as it was, I am—give me my land and everything, I would pay it, but I ain't going to without it. * * * Q. If you thought there was no sale of this land, what did you think that $200 was for? A. To get Jim's mind right—to keep him from going to the asylum. Q. Did he think that paying you $200 would get Jim's mind right? A. Thought, we could sorter smother up the land and get his mind right. Q. You stated that you thought when you signed this deed, that you were simply getting your old deed fixed up? A. I thought that I was getting my old deed back, all right—getting it fixed up, getting it straightened up. I was wanting to come down here to see about my business, and Jim Slade said I didn't have no business here, but that he was the man attending to the business, and attending to it in his name. Q. You didn't know, then, that this $200 had anything to do with this land? A. I told him it wasn't my money—it was Jim Slade's. I seen the money counted, taken off the secretary. Q. I know, but you didn't think that the $200 had anything to do with the land? A. I don't think it had anything to do with the buying of it. Jim Slade came to me and told me— Q. I don't care anything about what Jim Slade said now, which was it? You stated that this $200 was to get Jim's mind right. A. Yes, sir. Q. And then you stated that the $200 had something to do with the land. Now, which was it—to get the land right or to get Jim's mind right? A. Was to get Jim's mind right. She said he would go to the asylum, and she'd have all the children to support. My daughter was crying, and said Jim was going to the asylum, and there is nobody to support the children but me, and wanted me to do it to get his mind right. Q. Did his mind seem to have been improved any after you got the $200? A. Yes; he got better right straight. He was well in a little or no time. Then said he wasn't crazy, and he hadn't slept for four days and nights before then. * * * *"

Defendant testifies to the following effect, to wit: That he and Gibson went "down there" and he told plaintiff that he wanted to buy her land, not to give him an answer, at once, however, but to think it over; that in about half an hour she told him that she would take $200, whereupon he gave her a duebill for that amount, and agreed "to pay off a judgment on the records"; that he does not remember that anything was said at the time about the amount of the judgment or about any payment having been made on it on account, though he heard afterwards that such payment had been made; that he has paid the judgment "only to Jim, and he hasn't taken it off the books," and that he has forgotten how much he paid Jim; that he is unable even to approximate it; that it might have been $200 and it might have been $350; that he did not know at the time of the transaction what land was worth in that locality; that he had not sold or bought any land "by the acre" (he being more a dealer in timber, as we infer); that the reason that he happened to go down there was that "Gibson" sent for him; that it was, however, one of Jim Slade's sons who came for him, but he does not remember which one of them; that shortly after he had made the trade in question he and Mr. Elder had a conversation about the timber on the land, and he asked $2 a thousand for it; that Elder offered him a lump sum of $500 for the timber; that he does not know whether he would have taken $1,000 for it or not. Elder (the person referred to by defendant) is the representative of the Summit Lumber Company. He testifies that about 1902, when they were paying 50 cents a thousand for timber, he gave Jim Slade $500 for the timber on the land in question, thinking that he owned it all; that shortly after defendant bought from plaintiff he offered him, as well as he could remember, $500 for the timber, but defendant wanted $2 a thousand which, as witness figured, would mean $2,000;

that he told defendant that he could not do anything like that, as they (meaning himself, acting for his company) had already bought the timber from Jim Slade in a fair deal; that at that time his company was willing to pay unusually good prices for timbered lands in that neighborhood because of certain differences between it and the Union Sawmill Company.

Anderson, a witness for plaintiff, testifies that the minimum value of the land without the timber is $5 an acre, which, as we understand, includes the improvements. Dawkins, a witness for plaintiff, says that he sold some 40 or 80 acre tracts in that neighborhood a year later than the sale in question at $3 an acre, and that small tracts can usually be sold for better prices than large ones; that he does not know the exact location of the land in question. Adkins, a witness for plaintiff, says the land is worth $4 an acre minus the timber. He knows where the land is situated, but is not familiar with the whole tract.

Norris, witness for plaintiff, gives the same estimate with the same information. Elder, a witness for plaintiff, testifies, as stated, to having paid Jim Slade $500 for the timber on a basis of 50 cents a thousand, and having offered defendant another $500 for the same timber, basing his offer on an estimate that had been made to him of 1,000,000 feet on the tract.

Gibson, for defendant (being the same witness whose testimony has already been referred to), says the land without the timber is worth $2.50 or $3 an acre; does not know what it would have been worth with the timber on it; thinks 1,000,000 feet of timber would have sold in February, 1906, for $1,000 or $1,500. Being asked whether he knew of any land in that neighborhood being sold for less than from $3 to $5 an acre, he answered:

"No; I think it runs from about $2.50 to $5 an acre. It's owing to the amount of timber.

Of course, some small tracts sell higher with improvements."

Tugwell, witness for defendant, says that he bought 100 acres of land with the timber on it situated about a mile and a half from the tract in question for $190. He does not say when he made the purchase, or how much timber there was on the land. He further testifies that about the date of the sale here in question there was a good deal of competition between the mills, and that the price of lumber was pretty high; that the Summit Lumber Company said they would give $1.50 a thousand; that "they claimed [quoting] to give me $2, but I don't think they gave me 50 cents a thousand after it was scaled up."

The judge a quo says in his opinion:

"A fair preponderance of the evidence in the case shows the land to be worth $4 an acre, or the whole tract $1,960. The timber on the land is worth at the least valuation $500. These two sums, added together, make the whole property worth $2,460. It is conceded that plaintiff owns an undivided half interest in the property. Her share was, therefore, worth $1,230. From the recital in the deed, the defendant paid her $400 for her share; an amount less, by $830, than its value. It appears that the $400 mentioned in the deed was made up of $200 in money and the balance the estimated value of a judgment held by defendant's brother against plaintiff. There appears to be owing on the face of the judgment an amount in excess of $600, yet in the settlement claimed to have been made by defendant with J. J. Slade its value was evidently placed at less than $200, for in the settlement was included 70 acres of land worth at least $280. It should be noted that plaintiff testifies that a payment had been made on the judgment, and, further, that there had been no cancellation of the judgment. All that plaintiff actually received in the transaction was $200. This sum or the $400 mentioned in the deed falls short of being one-half of the value of her interest in the property. It is at least certain that she owns one-half community interest in the property, and the evidence introduced shows that she has probably settled with some of the heirs for their interest therein."

The decree reads as follows:

"It is therefore decreed * * * that there be judgment rescinding and setting aside the transfer of the following described land [giving the description] for lesion beyond moiety, upon plaintiff, Julia F. Brandon, restoring $200 to W. K. Slade, within 30 days after the finality of this judgment; and it is further provided [ordered?] that the defendant, W. K. Slade, be permitted to retain said property by paying to plaintiff the additional sum of $830, within the aforesaid said time."

Defendant has appealed. Plaintiff has neither appealed nor asked for an amendment of the judgment.

## Opinion.

We agree, in the main, with our learned Brother of the district court in his conclusions as to the facts.

We find no reason to doubt that at the date of the transaction in question two of plaintiff's children, including Mrs. Slade, had been paid all that was due them from their father's estate, and that the other, if not paid in full, had been partially paid; that J. J. Slade had been paid the greater part of the amount due him on the Sample & Co. judgment; and that defendant knew those facts and contracted with reference to them. As the situation then stood, therefore, it appears to us that plaintiff held the legal title to an undivided half interest in the property in question and an equitable title to an additional two-sixths interest, and perhaps more, the whole subject to the judicial mortgage securing the unpaid balance due on the Sample & Co. judgment. The amount of that balance both defendant and his brother have studiously refrained from estimating. The judge a quo, however, finds that included in the values for which the $415 was paid to J. J. Slade were 70 acres of land worth $280, which would leave apparently $135 to be attributed to the judgment. J. J. Slade admits that the 70 acres form, or formed, part of the 490 acres here in question, from which it would appear that, though his wife had been paid, in money and movables, all that she was entitled to from her father's succession, he nevertheless undertook to sell and defendant bought her interest in 70 acres of land which constituted part of that succession. How-

ever that may be, the money that defendant paid for the 70 acres of land, whether he got anything for it or not, did not reach the plaintiff, and was not paid for her account, nor was it a payment under the contract of the price or part of the price of the property sold by her. The act of sale between plaintiff and defendant (singularly enough) does not appear to have been offered in evidence, and is not in the record, but we conclude from all that has been said about it that the consideration stated in it is $400 cash, of which plaintiff seems actually to have touched $200, though it seems likely that, after the touching, it went into the pocket of J. J. Slade, where the other $200 certainly went, with an additional $215.

The fact that defendant bought the property with a mortgage resting on it opens the door for the argument that the mortgage debt was part of the price; and ordinarily that argument would be sound enough. But this is not an ordinary case. Here was an old woman living in the house with a son-in-law (brother of defendant) who assumed the position of the man of the family and gave her to understand that he would attend to all of her business, which included some business with his wife. The wife was paid for her interest in her father's succession, but no receipt was given, so that, when the issue is made, the man of the family is in a position to deny the payment or to say that it was only a partial payment.

It is conceded that the judgment held by him against his mother-in-law was paid, at least partially (though he denies it was paid by her), but it was allowed to remain recorded against her property as wholly unpaid. In that situation (according to his testimony), he "got worried out at the place, and wanted to make a clean shuffle of it all, and leave" for Texas, and he produced the impression on the mind of his mother-in-law that he was in danger of being sent to a lunatic asylum. There seems, however, to have been some method in his madness, since we find that in the middle of a wet, cold night he sent for his brother and his friends, who, responding to his summons, came to the house, and at the end of 12 hours, re-enforced by the tears of her daughter, succeeded in obtaining the signature of the plaintiff to the instrument which is here attacked. Neither defendant nor the witness Gibson pretend that they found that J. J. Slade needed them for any other purpose, and yet, in answer to the question, "What, if anything, did you have to do with the sale of this land from her to him?" he says:

"A. Nothing at all. She sold the land of her own free will, and afterwards danced over the floor and told her daughter she was going to Texas. She was proud of it—proud of the sale."

No other witness, however, testifies to this Terpsichorean effort. On the contrary, we find something ominously significant in the testimony of the witness Gibson (though he allowed a great deal to escape him that most people, under similar circumstances, would have seen and heard) to the effect that he thought it proper to warn the defendant: "If you buy this land, you buy it straight." And to warn plaintiff: "Mrs. Montgomery, you got this land back, and now, if you sell it, don't blame nobody but yourself." Defendant "remarked" (according to the witness) "he was buying it for W. K. Slade" (which appears to be defendant's name), "or for Mollie and the children," from which we may reasonably infer that he was looking out for the interest of himself and his family. And, that being the case, we may, also, reasonably infer that he found out before he signed the act of sale (if he signed it at all) what he would have to pay for the land he was buying; in other words, that he satisfied himself by agreement with his brother at whose instance he was there that $200 over and above the amount paid plaintiff in cash would clear the property of the mortgage which his brother held, for the reason

that the debt had already been partly paid. If, then, he knew that the debt represented by the mortgage had been reduced to $200 or less, and if, by agreement at the time with the holder of that debt he was to satisfy it by the payment of $200 or less, he cannot pose before the courts as an innocent third person misled by a public record.

Our learned Brother of the district court held that defendant should have the right to retain the property on payment of $830, which was equivalent to holding that he should retain the property on paying the difference between the amount already paid as the price and the value of the property at the date of the sale, but, if $1,230 was the value of the property and $830 represents the amount to be paid by the purchaser in order to entitle him to have the sale confirmed, it necessarily follows that he is credited with having already paid $400, and that, in the event of his not electing to have the sale confirmed, $400 (and not $200, as fixed by the judgment appealed from) is the amount which the vendor should pay him.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be amended by increasing the amount which the plaintiff is to reimburse defendant in the event of the latter's electing to rescind the sale from $200 to $400.

It is further decreed that, as thus amended, said judgment be affirmed, plaintiff and appellee to pay the costs of the appeal.